IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Richmond Division**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| ALPHA NATURAL RESOURCES, INC., | ) | Chapter 11 |
| *et al.*, | ) | |
| | ) | Case No. 15-33896-KRH |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| ——————————————— | ) | |
| | ) | |
| THE DAVID J. PIERCE TRUST U/A | ) | |
| DATED FEBRUARY 23, 2011, *et al.*, | ) | |
| | ) | |
| Appellants, | ) | |
| | ) | |
| v. | ) | Case No. 3:16-cv-709-HEH |
| | ) | |
| ALPHA NATURAL RESOURCES, INC., | ) | |
| *et al.*, | ) | |
| | ) | |
| Appellees. | ) | |

## MEMORANDUM OPINION
**(Affirming the Decision of the United States Bankruptcy Court)**

THIS MATTER is before the Court on appeal from the United States Bankruptcy

Court for the Eastern District of Virginia (the "Bankruptcy Court").  It evolves from a

dispute as to whether an agreement for royalty payments from coal mined on certain

tracts of land is an executory contract that the debtors may reject under § 365 of the

Bankruptcy Code.[1]  Appellants objected to the debtors' rejection of the agreement,

---

[1] Section 365 of the Bankruptcy Code allows a debtor in possession to assume, assign, or reject any lease or executory contract. 11 U.S.C. § 365(a).  An executory contract is one "under which the obligations of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete the performance would constitute a material breach excusing the performance of the other."

arguing that it conveyed an interest in real property and, therefore, that it could not be construed as an executory contract. (App. 515–556.)

On August 11, 2016, Judge Huennekens of the Bankruptcy Court entered a Memorandum Opinion and Order overruling Appellants' objections. *See In re Alpha Natural Res., Inc., et al.*, 555 B.R. 520 (Bankr. E.D. Va. 2016). Appellants filed their notice of appeal to this Court on August 26, 2016. (ECF No. 1.) Both sides filed memoranda in support of their positions, and oral argument followed on February 1, 2017.

For the reasons stated below, this Court will affirm the decision of the Bankruptcy Court.

## I.     JURISDICTION AND LEGAL STANDARD

As an initial matter, the Court finds that it has jurisdiction over this case pursuant to 28 U.S.C. § 158(a)(1) as this is an appeal from a final decision of the Bankruptcy Court. Appellants filed their notice of appeal within the time provided by Bankruptcy Rule 8002(a).

The standard of review applied by this Court is well-settled. The Bankruptcy Court's legal conclusions are reviewed *de novo* and its factual findings for clear error. *In re Harford Sands Inc.*, 372 F.3d 637, 639 (4th Cir. 2004).

## II.    FACTUAL FINDINGS AND LEGAL CONCLUSIONS OF THE BANKRUPTCY JUDGE

In order to fully grasp the Bankruptcy Court's analysis, some back story is

---

*Gloria Mfg. Corp. v. Int'l Ladies' Garment Workers' Union*, 734 F.2d 1020, 1022 (4th Cir. 1984) (citation omitted).

necessary to provide context. The following narrative represents the underlying facts, as found and described in Judge Huennekens's Memorandum Opinion.[2]

> The Organs and Ayrshire entered into [an] Agreement titled "Letter of Proposed Settlement" [(the "Agreement")] on January 22, 1969 (the "Acceptance Date"). The settlement addressed "certain differences between Ayrshire Collieries Corporation and [the Organs] respecting certain coal interests" involving coal seams in three areas.[3] The Agreement, as drafted by John Organ, states that "Mrs. Organ and I will accept the interests set out hereinafter as full settlement of our claims." The Agreement obligated Ayrshire to pay the Organs an amount calculated based upon a percentage of the coal mined and subsequently sold from each of . . . three separate areas. At issue in the case at bar is the area comprised of North and South Gillette in the state of Wyoming (the "North and South Gillette Areas"). Ayrshire was obligated to make monthly installment payments at the rate of one-half of one percent of the net realization (as defined in the Agreement) from coal mined and sold from the North and South Gillette Areas until December 31, 2019 (the "Payment Obligation").[4] John Organ agreed to assist Ayrshire in the use of coal across the three separate areas, and the Organs agreed to waive all claims against Ayrshire. Ayrshire also agreed to cancel an outstanding note made by John Organ, which note had an unpaid balance of $22,692.38.
>
> On the Acceptance Date of the Agreement, Ayrshire mined coal in the North and South Gillette Areas as a tenant under two federal leases

---

[2] The Appellants and Appellees do not take issue with any of the Bankruptcy Court's factual findings. (*See* Joint Br. of Appellants 3, ECF No. 10; Br. of Appellees 2, ECF No. 12.) At oral argument before this Court, however, Appellants appeared to raise one passing point of contention, namely that they were unable to determine the identity of who drafted the Agreement entered between the parties. This assertion conflicts with the finding by Judge Huennekens that John Organ was the original drafter, *see In re Alpha Resources, Inc.*, 555 B.R. at 524, and is in direct opposition with the Appellants' position at oral argument in the Bankruptcy Court. (App. 588 ("This document [the Agreement] is obviously written by Mr. Organ.").) Since Appellants have proffered no evidence that this finding was erroneous, and because the language in the Agreement clearly and convincingly supports a conclusion that John Organ was the original drafter, the Court will adopt the Bankruptcy Court's factual finding.

[3] The first area identified in the Agreement was the Illinois No. II coal seam in the state of Vermont, the second area was the Illinois No. VI coal seam in the state of Illinois, and the third area consisted of the Smith and Roland coal seams in North and South Gillette, Wyoming.

[4] The Agreement initially set a periodic payment amount for which Ayrshire was obligated for all three areas at a fixed rate of $30,000 per year payable in monthly installments until June 1, 1977, at which time the yearly obligation decreased to $18,000 payable in monthly installments until January 1, 1988.

between Ayrshire and the United States Department of Interior Bureau of
Land Management (the "Federal Leases"). The Federal Leases are nowhere
referenced in the Agreement. More than five years after the Acceptance
Date, the Organs unilaterally recorded a document titled "Memorandum of
Understanding" in the Campbell County, Wyoming, clerk's office (the
"Memorandum["]).[5] The Memorandum summarizes pertinent terms of the
Agreement between Ayrshire and the Organs, including the Payment
Obligation. The Memorandum also includes a description of the
underlying real property. The Memorandum notes that the described
property is subject to "U.S. Government coal leases," but it does not
identify the Federal Leases. Both of the Federal Leases were readjusted
effective September 1, 2015. Alpha Wyoming Land Company LLC is the
current lessee under the Federal Leases ("Alpha Wyoming Land
Company"). The readjusted Federal Leases do not contain any reference to
the Agreement between Ayrshire and the Organs.

On August 3, 2015, Alpha Natural Resources, Inc., and 149[6] of its
direct and indirect subsidiaries, including Alpha Wyoming Land Company,
(the "Debtors") commenced bankruptcy cases by each filing a separate
voluntary petition for relief under chapter 11 of the Bankruptcy Code in the
United States Bankruptcy Court for the Eastern District of Virginia. As the
current lessee under the Federal Leases, and as successor in interest to
Ayrshire, Alpha Wyoming Land Company [sought] to assume and assign
the Federal Leases in connection with the Debtors' reorganization. See 11
U.S.C. § 365(a). In connection with that transaction, the Debtors want[ed]
to reject the Agreement with the Organs.

The [Appellants, who are successors in interest to and descendants
of the Organs,] argue[d] that the Agreement cannot be rejected as an
executory contract under § 365 of the Bankruptcy Code. The [Appellants]
maintain[ed] that the Payment Obligation due under the Agreement is not a
contractual obligation owed by Ayrshire, but instead constitutes an interest
in real property to which they have become seized. The [Appellants]
argue[d] that the Agreement must be assumed and assigned as part of the
Federal Leases.

*In re Alpha Natural Res., Inc.*, 555 B.R. at 524–25.

---

[5] The Memorandum is not executed by either Ayrshire or the United States Department of Interior Bureau of Land Management, but rather is endorsed solely by the Organs.

[6] The chapter 11 petition for one of the Debtors' subsidiaries, Grey Hawk, has since been withdrawn. Order Dismissing Case, *In re Alpha Natural Resources, Inc.*, No. 15-33896 (Bankr. E.D. Va. Oct. 8, 2015) (ECF No. 638).

In a well-reasoned and thorough opinion, the Bankruptcy Court found that the Agreement did not create a real property interest, but rather a contractual obligation, tied to the amount of coal mined and sold from the North and South Gillette Areas. *Id.* at 526. Judge Huennekens articulated three justifications to support his finding that the Agreement did not show a clear intent to transfer real property, as required by Wyoming law. First, the Bankruptcy Court found that the Agreement lacks any words indicating the conveyance of real property. *Id.* at 526–28. Second, it determined that Ayrshire's interest in the North and South Gillette Areas was solely a leasehold interest, yet the Agreement conspicuously failed to mention the underlying lease. *Id.* at 528. Moreover, the Bankruptcy Court determined that the time period for payments under the Agreement extended beyond the term of the then-existing lease. *Id.* And third, Judge Huennekens determined that Ayrshire would have been required to obtain Bureau of Land Management approval prior to assigning any interest in its lease. *Id.* at 528–29. The Bankruptcy Court concluded that Ayrshire's failure to do so further evidences the parties' intent for the Agreement to merely convey a contractual right. *See id.*

### III.   ASSIGNMENTS OF ERROR

The Appellants have posed the following assignments of error for review:

1. Did the Bankruptcy Court err in concluding that under Wyoming law the Agreement created only contractual rights personal to the parties and did not intend to convey and it did not convey an overriding royalty interest or any other interest to the Organs in the North and South Gillette Areas?

2. Did the Bankruptcy Court err in concluding that under Wyoming law the conveyance of a mineral royalty interest must identify an underlying

mineral lease and must be tied to the terms of the underlying lease?

3. Did the Bankruptcy Court err in concluding that the lack of approval by the Bureau of Land Management ("BLM") of the assignment or transfer of any interest to the Organs affects the validity, enforceability, or nature of the conveyance of a mineral royalty interest with respect to land leased from the BLM?

4. Did the Bankruptcy Court err in concluding that under Wyoming law a memorandum recorded in the land records must be signed by a party other than the holder of the overriding mineral royalty interest that is the subject of the memorandum?[7]

## IV.   ANALYSIS

Although the underlying facts are a bit convoluted, this appeal turns on well-established principles of Wyoming real property and contract law. "Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." *Butner v. United States*, 440 U.S. 48, 55 (1979); *see Tidewater Fin. Co. v. Kenney*, 531 F.3d 312, 318–19 (4th Cir. 2008). This Court should apply the underlying substantive law that gave rise to the obligation in question. *Raleigh v. Illinois Dept. of Rev.*, 530 U.S. 15, 20 (2000).

---

[7] The Court notes that this is an unfair characterization of the Bankruptcy Court's holding. At no point in the Memorandum Opinion did Judge Huennekens reference a requirement that the Memorandum be signed by a party other than the Organs. Instead, the Memorandum Opinion merely noted that "[t]he Memorandum is not executed by either Ayrshire or the [BLM], but rather is endorsed solely by the Organs." *In re Alpha Natural Resources*, 555 B.R. at 524 n.6. Contrary to Appellants' assignment of error, the Bankruptcy Court referenced the Memorandum multiple times in its analysis. Regardless, the Court concludes that the Memorandum itself cannot be construed in any way to grant a real property interest absent Ayrshire's signature. *See* Wyo. Stat. Ann. § 34-1-113 ("Execution of deeds, mortgages or other conveyances of lands, or any interest in lands, shall be acknowledged by the party or parties executing same, before any notarial officer."); *see also Thomas v. Roth*, 386 P.2d 926, 930 (Wyo. 1963) ("[I]f an instrument required for recordation to be acknowledged is without an acknowledgment and is admitted to record, the recordation does not afford constructive notice of the existence and contents of the instrument.")

Wyoming law is clear that a royalty interest—which is analogous to a net profit interest[8]—can take many forms. *See Ferguson v. Coronado Oil Co.*, 884 P.2d 971, 976–77 (Wyo. 1994). It can be: (1) "a contractual right that is personal to the parties"; (2) "a covenant running with the land or with a lease"; (3) "a charge on the land"; (4) "a separately identifiable property interest with its own recognized incidents"; or (5) "it can create a lease or a sublease" *Id.* at 976 (citation and quotation marks omitted). To determine what type of interest is conveyed in the Agreement, like all contract interpretation under Wyoming law, the Court must focus on the parties' intent. *See Boley v. Greenough*, 22 P.3d 854, 858 (Wyo. 2001). Wyoming has "rejected any rigid rule of law established by the courts without regard to the parties' intent." *Mullinnix LLC v. HKB Royalty Trust*, 126 P.3d 909, 922 (Wyo. 2006). Therefore, Wyoming courts will not construe a contract so as to negate any express terms in the contract or to frustrate the overriding purpose of the agreement. *Boley*, 22 P.3d at 859.

For the reasons stated below, the Court finds that the Agreement's language indicates an intent to convey a contractual obligation and nothing else.

## a. The Agreement Lacks Language of Conveyance

In order to transfer an interest in real property—such as an overriding royalty

---

[8] The Wyoming Supreme Court has found that a "net profit interest entitl[ing its holder] to a share of the proceeds from production in the oil and gas field . . . is similar to a non-participating royalty interest." *Ferguson v. Coronado Oil Co.*, 884 P.2d 971, 977 (Wyo. 1994). As the Bankruptcy Court noted, "[t]he Wyoming Supreme Court in *Coronado Oil* indicates that a real property interest can only arise in favor of a grantee of a mineral interest when the grantee has title to the mineral while they are *in situs*. The Agreement in this case does not purport to give the Organs title to the minerals while they are in the ground, but rather a small percentage of earned royalties based on the amount mined and sold. The case at bar is analogous to *Coronado Oil* because it involves the disposition of the proceeds due to the royalty owner after the oil and gas has been removed from the ground and sold." *In re Alpha Natural Res., Inc.*, 555 B.R. 529 n.13 (citations and quotation marks omitted).

interest—under Wyoming law, the conveyance "must contain sufficient words to show an intention to convey." *DeWitt v. Balben*, 718 P.2d 854, 860–61 (Wyo. 1986) (quoting *Whalon v. North Platte Canal & Colonization Co.*, 71 P. 995, 999 (Wyo. 1903)). Wyoming courts look for operative words of conveyance, such as "transfer," "sell," or "assign" to indicate an intent to transfer a real property interest. *Id.* (citing *Whalon*, 71 P. at 999 (holding that an instrument that included the words "transfer" and "sell" demonstrate an intent to constitute a conveyance)). "Although no particular words are required to convey real property, the language of the document must indicate a specific intention to convey the property." *Mullinnix*, 126 P.3d at 922.

The Agreement, drafted by John Organ, provides that he and his wife "will accept the interests set out hereinafter as full settlement of our claims [against Ayrshire]," and sets forth "the areas involved, the royalties to be paid, [and] the description of the properties . . . ." (App. 545.) With reference to the Wyoming property, it goes on to describe the interest owed as follows:

> The earned royalty to be paid by Ayrshire to us or our successors or assigns in respect to the so-called North and South Gillette, Wyoming areas is at the rate of one half (1/2) of one percent (1%) of the net realization. The obligation of Ayrshire in respect to the payment of royalties as herein provided for each the North and South Gillette areas shall continue until the end of the business day December 31st, 2019, at which time Ayrshire's obligation shall cease.

(*Id.* at 546.) The Agreement concludes:

> The provisions hereof shall be binding upon and inure to the benefit of the successor and assigns of the parties hereto.
>
> If this offer is accepted by the Ayrshire Board of Directors, please have the acceptance indicated below and return one copy of this letter to me . . . .

(*Id.* at 547–48.)

After reviewing the Agreement, the Bankruptcy Court found that the language in the document "does not show a clear intention to transfer a real property interest." *In re Alpha Natural Res., Inc.*, 555 B.R. at 527. Judge Huennekens reasoned that it "is devoid of any words of conveyance. . . . The words overriding royalty do not appear anywhere in the Agreement . . . . [And] [w]ords such as 'grant,' 'transfer,' 'convey,' or 'reserve' are notably absent . . . ." *Id.* Moreover, the Bankruptcy Court concluded that "[t]he term 'accept' does not evidence the clear intent to convey an interest in the lease or real property that Wyoming law requires." *Id.* at 527–28 (citing *Mullinnix*, 126 P.3d at 922); *see also id.* at 528 n. 10 ("The term 'acceptance' is a contractual term used to demonstrate the offeree's assent, so that a binding contract can be formed." (citation omitted)).

Appellants concede that "the instrument must contain sufficient words to show an intention to convey," but they urge the Court to find that the terms "royalty" and "interest" in the agreement suffice to satisfy that standard. However, the Court agrees with the Bankruptcy Court that they do not. First, contrary to the Appellants' assertion, the word "royalty" does not automatically create a real property interest. As discussed, a royalty can take many forms, including a "a contractual right that is personal to the parties." *Ferguson*, 884 P.2d at 976. Likewise, the word "interest" is not a term used exclusively in the context of real property ownership. Certainly someone can have an interest in real property. But he can also have an interest in a business entity, a liberty

9

interest, or as in this case a contractual interest.

Moreover, even if the terms "royalty" and "interest" were used in a real property context in the Agreement, they alone are inadequate to demonstrate compliance with Wyoming's requirement to indicate a specific intention to convey a real property interest. As explained by the Wyoming Supreme Court, examples of this type of language include: "transfer," "sell," "assign," "set over," and "release." *DeWitt*, 718 P.2d at 861. While this is not an exhaustive list, the Court notes that all of the words used as exemplars are active verbs meant to effectuate the grantor's intent. In this case, there is no language in the Agreement indicating any type of active conveyance by Ayrshire. Rather, the Agreement merely states that the Organs "will accept the interests set out hereinafter as full settlement of our claims." This passive acceptance is clearly deficient under settled Wyoming law.

Because the Agreement is devoid of any active language indicating Ayrshire's specific intent to convey a real property interest, the Court finds that Ayrshire merely intended to grant the Organs a contractual right to receive payments.

### b. The Agreement Makes No Reference to the Underlying Leases

Appellants assert that the Agreement intended to convey an overriding royalty, which is "a share of production, free of the costs of production, carved out of the lessee's interest under the oil and gas lease." Wyo. Stat. Ann. § 30-5-304. According to settled Wyoming law, an overriding royalty is a non-possessory interest in real property carved out of the lessee's interest in a lease in favor of another party. *See Connaghan v. Eighty-Eight Oil Co.*, 750 P.2d 1321, 1324 (Wyo. 1988); *see also Meeker v. Ambassador Oil*

*Co.*, 308 F.2d 875, 882 (10th Cir. 1962), *rev'd on other grounds*, 375 U.S. 160 (1963) ("It is an interest carved out of the lessee's share of the [coal], ordinarily called the working interest, as distinguished from the owner's reserved royalty interest.").

The Agreement makes only a passing mention of the Wyoming real property that it encompasses, describing it as "North and South Gillette in Wyoming: Consisting of coal seams Smith and Roland as indicated on the maps attached hereto marked Exhibit C for North Gillette and Exhibit D for South Gillette." (App. 546.) Significantly, the document makes no reference to the underlying Federal Leases through which Ayrshire held its interest in the land and out of which the purported overriding royalty interest was to be carved. The Bankruptcy Court found this deficiency to be of great import, noting that "[a]s an overriding royalty is an interest in an underlying mineral lease, the underlying lease should be described in the conveyance. . . . The lack of any description of the Federal Leases leads the Court to conclude the Payment Obligation in favor of the Organs is contractual in nature." *In re Alpha Natural Res., Inc.*, 555 B.R. at 528.

Appellants contend that the Bankruptcy Court reached this conclusion in error, arguing that "there is no requirement that a conveyance of a royalty interest be specifically tied to an underlying lease. Rather, what is required is just that the instrument must sufficiently describe the lands involved." (Joint Br. of Appellants 14.) In support of this proposition, Appellants cite the Wyoming Supreme Court's decision in *Pullar v. Huelle*, where it held that the statute of frauds is satisfied in a contract for the sale of real property so long as the writing "contain[s] an adequate description or . . . furnish[es] the means by which the land can be identified." 73 P.3d 1038, 1040 (Wyo.

11

2003). Appellants also cite the Wyoming Supreme Court's decision in *Boley*, where the court found that several assignments conveyed a royalty interest, despite the fact that the grantors did not "own leasehold interests in any of the lands described in the assignments," and, therefore, made no reference to the non-existent leases. 22 P.3d at 857–60.

However, the Court finds that this case is readily distinguishable from both of those decisions if for no other reason than that the grantor in both *Pullar* and *Boley* was the fee simple owner of the real property at issue, while Ayrshire merely owned a leasehold interest in the Wyoming property at the time of the Agreement. But for the underlying Federal Leases, Ayrshire would have had no interest to be carved out in order to create an overriding royalty. It could not convey any interest that was greater than what it currently possessed.

Therefore, while it is not determinative of the issue at hand, the Court finds the fact that the Agreement fails to reference Ayrshire's leasehold interest to be significant in looking to the intent of the parties. If this were, in fact, an attempt to convey a real property interest, the Court can think of no logical explanation as to why the parties would intentionally omit the very ownership interest possessed by the grantor that was being carved out in favor of the Organs. Consequently, the Court finds that such an oversight presents strong evidence in support of the conclusion that the parties merely intended to convey a contractual interest.

### c. The Agreement Lacked BLM Approval

In its Memorandum Opinion, the Bankruptcy Court noted that the Federal Leases

12

under which Ayrshire was mining the North and South Gillette Areas required BLM

approval of any assignment or transfer of the leases—including the granting of a royalty

interest. *See In re Alpha Natural Res., Inc.*, 555 B.R. at 528–29. Appellants contend that

this was error on the part of the Bankruptcy Court. They argue that failure to obtain

BLM approval does not render a real property transfer void. Appellants are correct in

this statement of the law—a point which Appellees have conceded. (*See* Br. of Appellees

15–17.) However, Appellants appear to have misconstrued the Bankruptcy Court's

holding.

The Bankruptcy Court never stated that failure to obtain BLM approval destroyed

what would otherwise be a valid real property interest. Rather, the Bankruptcy Court

merely cited the lack of BLM approval as additional evidence that the parties never

intended the Agreement to convey a real property interest. And this Court agrees.

Had Ayrshire intended to convey an interest in real property, presumably it would

have obtained BLM permission in order to avoid breaching the Federal Leases. (*See*

App. 637 ("[A]ny assignment or transfer made of this lease, whether by direct

assignment, operating agreement, working or royalty interest, or otherwise. . . . will take

effect the first day of the month following its approval by the Bureau of land

Management.").) Moreover, the Organs would have been particularly interested in

ensuring that Ayrshire obtained BLM approval of any conveyance of a real property

interest. Failure to do so could result in termination of the underlying lease. (*See id.* at

638 ("If the lessee shall . . . default in the performance or observance of any of the

provisions of this lease   . . . the lessor may institute appropriate proceedings in a court of

13

competent jurisdiction for the forfeiture and cancellation of this lease . . . .").) Any real

property interest that Ayrshire could grant would be limited to a portion of its own

leasehold interest.  A termination of the lease would also have resulted in a termination of

any interest—including the Organs' hypothetical overriding royalty—carved out of that

lease.  Thus, the lack of BLM approval is further evidence that the parties intended to

convey only a contractual right.

### d. Ambiguity Must be Construed Against the Agreement's Drafter

While the Agreement contains ample evidence that the parties did not intend to

convey a real property interest, even if it could be considered ambiguous, the Court must

reach the same result.  A bedrock principle of Wyoming contract law is that "any

ambiguity in the contract is construed against the drafter of the agreement." *Collins v.*

*Finnell*, 29 P.3d 93, 100 (Wyo. 2001).  Here, there is no question that John Organ drafted

the agreement and that the Appellants are his successors in interest.  Therefore, to the

extent that it may be considered ambiguous, that ambiguity must be resolved in favor of

the Appellees with a finding that the Agreement conveyed only a contractual interest and

not a real property interest.

## V.    CONCLUSION

While the Court is mindful that disagreement over characterizations will always

exist, it is also cognizant of the limited role it has in this appeal.  As discussed above,

there is an abundance of evidence supporting the well-reasoned decision of the

Bankruptcy Court.  Thus the Court finds no clear error in any of the Bankruptcy Court's

factual findings.  Further, this Court finds all legal conclusions of the Bankruptcy Court

to be based on sound reasoning.

Therefore, this Court will affirm the judgment of the Bankruptcy Court in its
entirety.  An appropriate Order will accompany this Memorandum Opinion.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel
of record.

It is so ORDERED.

_____ /s/
Henry E. Hudson
United States District Judge

Date: Feb 21, 2016
Richmond, Virginia

15